609 So.2d 1119 (1992)
Jack L. JEROME, Plaintiff-Appellant,
v.
Don H. DUGGAN, et al., Defendants-Appellees.
No. 24247-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1992.
*1120 James L. Fortson, Robert M. Davis, III, Shreveport, for plaintiff-appellant.
Pugh, Pugh & Pugh by Robert G. Pugh, Shreveport, for defendants-appellees.
Before LINDSAY, BROWN and STEWART, JJ.
LINDSAY, Judge.
This suit addresses the plaintiff's entitlement to a percentage of the alleged gain on the sale of stock in a corporation. The plaintiff, Jack L. Jerome, appeals from a trial court judgment which rejected his primary demands against the defendants, Duggan Machine Corporation; Don H. Duggan (hereinafter referred to as "Mr. Duggan"); his wife, Molly Jones Duggan; and their children, Don Dee Duggan, Molly Anne Duggan, and Dan Michael Duggan.[1] The plaintiff also complains that two-thirds of the court costs were assessed against him. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
The late Don H. Duggan was involved in the formation and operation of several corporations, including Duggan Machine Company, Inc. (DMI). DMI was in the machine shop business and repaired oil rigs. At all relevant times in this suit, Mr. Duggan and his wife owned 75 percent of the stock in DMI, while the remaining 25 percent was owned by their children.
In 1978, the plaintiff was hired by DMI as machinery manager and vice president in charge of engineering. Mr. Duggan hired the plaintiff because he felt the plaintiff's expertise would be valuable in designing oil rigs for production by DMI.
Their letter agreement, dated April 26, 1978, and signed by Mr. Duggan as chairman of the board, provided as follows:
At the end of one years [sic] service, 10% of Duggan Machine Co., Inc. stock would be made available to you, if both parties are satisfied. The cost of such stock would be determined by you, the company and our C.P.A. firm. We will loan you the money for said purchase.
On both the first and second anniversaries of the plaintiff's employment with DMI, Mr. Duggan made the stock available to the plaintiff for purchase. (Mr. Duggan testified that the provision in the letter about loaning money to the plaintiff was intended to relieve him of the necessity of coming up with cash.) The plaintiff never paid any money for any stock, nor did he borrow money to buy the stock, or apply any of the bonus money he earned toward the purchase of the stock. However, the plaintiff insisted that he "paid" for the stock through his services to the company.
In 1981, DMI was sold to a subsidiary of Anglo Energy, Ltd., and became known as Duggan Equipment, Inc. (DEI). The sales price was $4.75 million. Twenty-five (25) percent of the purchase price was to be paid at closing, followed by payments of 15 *1121 percent of the balance of the purchase price each year for five years.
As part of the sales agreement, Mr. Duggan agreed to stay and run the company for five years. Mr. Duggan testified that, due to the high volume of work and his need for the plaintiff's continuing assistance, he agreed to pay the plaintiff 10 percent of the "gain" from the sale of the stock in the company if the plaintiff would also remain with the company. (The gain was computed by using a base of $3 million, the estimated value of the company at the time the plaintiff was hired.) Mr. Duggan testified that he told the plaintiff that the payments to the plaintiff would be made from the payments made to the Duggans as they were received from Anglo Energy.
In June of 1981, the plaintiff received payments of $43,750 from the defendants. In August, 1982, he received additional payments of $26,250. These funds were paid to the plaintiff as the defendants received their purchase price payments from Anglo Energy. (Each defendant paid by personal check in proportion to his or her ownership of stock.)
In about 1982, the oil industry suffered a substantial decline. As a result, Anglo Energy began encountering severe financial problems. Early in 1983, it informed Mr. Duggan that it could not pay the next purchase price installment and asked if he would be interested in taking the company back. Thereafter, Mr. Duggan formed Duggan Machine Corporation (DMC) to reacquire the assets of DMI.
In the summer of 1983, DMC and Anglo Energy, through DEI, entered into an agreement by which the Duggans reacquired most of the fixed assets originally sold to Anglo Energy, i.e., the equipment, plant, and inventory. However, Anglo Energy had drained the company of all cash. At this point, the 1983 installment of the purchase price was paid to the Duggans. However, no corresponding payment was made by the defendants to the plaintiff after the defendants received these funds, as had been done previously in 1981 and 1982.
Subsequently, Anglo Energy filed bankruptcy. After Anglo Energy defaulted on the 1984 installment of the original purchase price, the Duggans and Anglo Energy entered into a settlement by which they cancelled out each other's indebtedness and their business connection was totally severed. According to Mr. Duggan's testimony, the defendants actually suffered a loss on the total transaction of approximately $1 million.
The plaintiff was aware of the Duggans' problems with Anglo Energy, although he was not directly involved in the buy-back negotiations. Following the formation of DMC, and with plaintiff's full awareness that the deal with Anglo Energy had "gone sour," the plaintiff and the Duggans entered into a settlement agreement designed to cover any amounts the plaintiff was supposedly owed by the Duggans. On September 1, 1983, the plaintiff signed a settlement agreement with the defendants in which he released the Duggans from any claim he might have against them or any obligation concerning his possible ownership of any stock in a Duggan-related entity. The settlement provided for payment to the plaintiff of the sum of $7,500. Within a few days, Mr. Duggan's secretary delivered a check in that amount, which was dated September 2, 1983, to the plaintiff. However, the plaintiff now insists that he signed the settlement by accident.
Following the plaintiff's execution of the settlement agreement, he continued to work for the Duggans and the new corporation (DMC). However, he was terminated in 1986 due to a lack of work. In 1987, some six months after his termination, the plaintiff presented the 1983 settlement check for $7,500 to the bank. Although the bank originally honored this "stale" check, a complaint from Mr. Duggan a month later caused the bank to recredit Mr. Duggan's account and "charge back" the amount of the check against the plaintiff's account.
On June 4, 1987, the plaintiff filed suit against DMC and its shareholders and officers, the Duggans. The plaintiff sought 10 percent of the agreed price for the sale of *1122 DMI to Anglo Energy. Alternatively, he requested the amount of $7,500, the amount due under the settlement agreement.
Trial was held in July, 1989. Testimony was given by the plaintiff and his wife, as well as Mr. Duggan, his children, and his accountant. The plaintiff testified that he was seeking to recover approximately $105,000, or about 60 percent of the 10 percent gain from the sale of the assets of DMI to Anglo Energy. (He admitted receipt of the other 40 percent of the alleged gain.) The testimony of all parties was in agreement that the base upon which any gain was to be calculated was $3 million.
In a written opinion issued in September, 1991, the trial court found that Mr. Duggan agreed to pay the plaintiff 10 percent of the gain on the sale. However, no gain was realized because of Anglo Energy's default. Since Anglo Energy only paid $2,612,500, or 55 percent of the $4.75 million sales price, before defaulting, no gain was realized. Thus, the defendants were not obligated to the plaintiff.
The court also found that the payments made by the defendants to the plaintiff were not personal gifts, as several of the defendants testified, but were actually payments made pursuant to the agreement.
The court rejected the claim presented in plaintiff's brief for ownership of 10 percent of the stock. The court accepted his testimony that he was claiming only the 10 percent gain on the sale. The court further found that the plaintiff was not a creditor of the defendants so as to be entitled to protection under the Bulk Sales Law.
However, the court did find that there was a binding settlement agreement between the parties. The trial court found that the plaintiff met with counsel for the defendants and agreed to settle his claims against the defendants for "$7,500 over and above the amount already paid to plaintiff on the expected gain." Finding the settlement to be binding on both sides, the trial court ordered that the defendants pay the consideration of $7,500 to the plaintiff, plus legal interest from the date of judicial demand until paid. All of the plaintiff's other demands were rejected. The judgment provided that two-thirds of the costs were to be assessed against the plaintiff.
The plaintiff appeals. His assignments of error are as follows: (1) the trial court erred in holding that there was no gain from the sale, and, consequently, the defendants were not obligated to pay the plaintiff 10 percent of the alleged gain from the sale of the stock; (2) the trial court erred in finding that the plaintiff was not a creditor for purposes of the Bulk Sales Act; (3) the trial court erred in finding that the settlement agreement was binding; and (4) the trial court erred in assessing two-thirds of the court costs against him. Due to our resolution of the third assignment of error, we pretermit consideration of the first two assignments of error.

VALIDITY OF THE SETTLEMENT AGREEMENT
The plaintiff claims that the trial court erred in finding that he was bound by the settlement agreement, which he claimed had been signed by mistake. In support of his contention that he signed the agreement in error, he relied upon his failure to negotiate the check for about three years after the signing of the document.
The brief, but very specific, two-page settlement agreement was executed by the plaintiff on September 1, 1983. It is in the form of an affidavit wherein the plaintiff declares as follows:
... on or about the time Appearer was initially employed by Duggan Machine Company, Inc., Appearer and Don H. Duggan discussed the feasibility of Appearer obtaining stock in Duggan Equipment Company, Inc. As a result of this discussion, Don H. Duggan agreed to pay Appearer a sum equivalent to 10% on the gain derived by the said Don H. Duggan and his family from the sale of stock to a subsidiary of Anglo Energy Limited. In furtherance thereof, certain payments have been heretofore made, the receipt and sufficiency of which is hereby acknowledged.
*1123 On even date, the Duggan family has agreed to take the assets of the former Duggan Equipment Company, Inc., back and to pay a sum certain in connection therewith.
In light of this, Appearer and Don H. Duggan have agreed to a settlement relating to any claim that Appearer might have as against Don H. Duggan, his wife, Molly, their children, or any entity, corporate or partnership, concerning which any of said Duggan Family has an interest. The consideration therefor is the sum of SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($7,500.00), which sum has been paid by Don H. Duggan and for which receipt is now formally given.
In connection therewith, Appearer releases Don H. Duggan, his wife, Molly, and all members of his family from any obligation Appearer may have had or might have in connection with the possible ownership by Appearer of any stock in a Duggan-related entity.

(Emphasis ours.)
The check delivered to the plaintiff by Mr. Duggan's secretary shortly thereafter was dated September 2, 1983, and signed by Mr. Duggan. On the back was the following typed notation:
This check is being given & received in full settlement of any claim that payee might have concerning the acquisition or sale of stock of Duggan Machine Co. & releases Duggan Machine Co., Inc., Don H. Duggan, Molly J. Duggan, Molly A. Duggan, Mike Duggan & Don D. Duggan from any & all obligations concerning same.
The plaintiff's signature is found immediately below this statement.
The plaintiff contends that the settlement is not binding. He testified that in September, 1983, he went to the office of Mr. Duggan's attorney to sign some papers. He testified that he thought the "papers" simply involved the new corporation, DMC. He stated that he did not read the papers he signed in the attorney's office. However, he admitted that he was given a copy of the settlement which he subsequently read that night. (He also testified that, while he was given a copy of the settlement agreement which he had signed, he was not given copies of any of the other documents he claimed to have signed.) He further conceded that no one prevented him from reading the documents in the attorney's office, and that he never called Mr. Duggan or Mr. Duggan's attorney after he read the settlement to tell them that a mistake had been made.
A few days after the plaintiff signed the settlement agreement, he received Mr. Duggan's check for $7,500. Again, he failed to protest or advise anyone that he had not agreed to the settlement. He testified that because he did not agree with the release language on the back of the check, he initially refrained from cashing it.
The plaintiff testified that after his termination at DMC in 1986 he did not work for about a year by his own choice. Eventually the "novelty" of not working wore off, and he began to reevaluate his financial position. He testified that, since he did not want to sue the Duggans, he decided to cash the check. The check was negotiated by the plaintiff at the Commercial National Bank on February 6, 1987.

Law
Compromises are favored and are not invalidated lightly. Succession of Teddlie, 385 So.2d 902 (La.App.2d Cir.1980), writ denied, 393 So.2d 742 (La.1980); Stone v. State Farm Mutual Automobile Insurance Company, 501 So.2d 852 (La.App. 5th Cir.1987).
A contract of compromise must be in writing to be enforceable. LSA-C.C. Art. 3071; Doga v. Southern Farm Bureau Insurance Company, 511 So.2d 78 (La.App. 3d Cir.1987). It cannot be attacked on account of any error in law or any lesion, although an error in calculation may be corrected. LSA-C.C. Art. 3078. However, it may be rescinded on account of fraud, violence, or an error in the person or on the matter in dispute. LSA-C.C. Art. 3079.
*1124 A draft may serve as a written compromise where it recites that it is in full payment for all claims and the draft is endorsed and negotiated. Audubon Insurance Company v. Farr, 453 So.2d 232 (La. 1984); Van-Trow Olds Cadillac, Inc. v. Dodwell, 229 So.2d 154 (La.App. 2d Cir. 1969); Doga, supra. Whether a draft has been tendered and accepted as full payment is a question of fact. Doga, supra.
In Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981), the plaintiff, who had been injured in an accident, signed a release form provided by the defendant's insurance adjuster. The following day a check was mailed to the plaintiff. However, the plaintiff never presented the draft to the bank for payment. Thereafter, the plaintiff filed suit, and the defendants responded with a peremptory exception of res judicata based on the settlement. The trial court sustained the exception, finding a valid and binding settlement. The appellate court affirmed.
The Supreme Court granted writs and likewise affirmed. It held that where two instruments, when read together, outline the obligations each party has to the other and evidence each party's acquiescence in the agreement, a written compromise agreement, as contemplated by LSA-C.C. Art. 3071, has been perfected. Felder, supra at 524.
The court in Felder found that the settlement signed by the plaintiff sufficed as a written offer by the plaintiff to settle all of his claims against the defendants for a specific sum. The check issued on behalf of the defendants for that amount contained a notation that it was in settlement in full of all claims to the plaintiff for a loss that occurred on a particular date, i.e., the date of the accident. The court found that the written and signed draft served as a written acceptance of the plaintiff's written offer. Thus, the court concluded that when read together the documents constituted an enforceable compromise agreement.
The plaintiff in the Felder case argued that the settlement was not valid because the draft was not negotiable and he had never presented it for payment. The court concluded that the draft still sufficed as a written acceptance of the plaintiff's written settlement, effecting a valid written compromise agreement between the parties under LSA-C.C. Art. 3071, even if the draft was not negotiable. The court also rejected the plaintiff's contention that his failure to negotiate the check nullified the agreement. It found that the plaintiff had failed to try to withdraw his offer to compromise prior to his receipt of the draft. (Had he done so, the draft would have been only a written offer to settle by the defendants. With no acceptance by the plaintiff, it would not have created a binding agreement between the parties.)

Discussion
The trial court rejected the plaintiff's testimony that he signed the settlement by mistake. It specifically found that the plaintiff met with the defendants' counsel and agreed to settle his claims for $7,500. Such a finding is supported by the record. Although the plaintiff claimed that he believed that he was only signing documents pertaining to DMC in his capacity as vice president, Mr. Duggan testified that the plaintiff never signed any such papers. Also, the plaintiff admitted that he received a copy of the settlement agreement and the check for $7,500, and that he never communicated to the defendants his alleged disagreement with the terms of the settlement.
In the present case, the issuance of the check by the defendants and the receipt of the check by the plaintiff was a written acceptance of the plaintiff's written offer to settle, Felder, supra, which created an enforceable settlement agreement. The check, like the settlement agreement, recited that the plaintiff's claims against the Duggans concerning the stock were being settled in full.
Even assuming arguendo that the plaintiff originally signed the settlement agreement in error, the plaintiff's own testimony established that he subsequently decided to accept the settlement, signed the *1125 back of the check, and presented the check to the bank for payment. At that point, at the very latest, an enforceable settlement existed between the parties.[2]
Consequently, we find that the trial court was correct in finding that all claims between the parties had been settled and that the settlement agreement was enforceable. This agreement settled all of the plaintiff's claims involving the stock in the defendants' companies.
This assignment of error is meritless. As a result, we find that it is unnecessary to address the plaintiff's assignments of error concerning the alleged gain and the applicability of the Bulk Sales Law.

COURT COSTS
The plaintiff also argues that the trial court erred in assessing two-thirds of the court costs against him when he was the prevailing party.
Generally, costs are to be paid by the party cast. However, the court is vested with broad discretion in the fixing of court costs. LSA-C.C.P. Art. 1920; Theriot v. P & R Farms, Inc., 527 So.2d 3 (La.App. 3d Cir.1988), writ denied, 528 So.2d 154 (La. 1988); Hidalgo Motors, Inc. v. Opelousas Courtesy Motors, Inc., 576 So.2d 1086 (La. App. 3d Cir.1991).
Although the plaintiff obtained a judgment in his favor on his alternative demand for enforcement of the settlement, the court rejected all of the plaintiff's other demands. Thus, we find no abuse of discretion in the trial court's assessment of costs in the present case.
This assignment of error is without merit.

CONCLUSION
The judgment of the trial court is affirmed. Costs are assessed against the appellant/plaintiff.
AFFIRMED.
NOTES
[1] Following Mr. Duggan's death in October, 1992, and while this case was on appeal, his widow, as testamentary executrix of his succession, was substituted for Mr. Duggan as a party defendant.
[2] Much is made of the fact that the check was not presented to the bank for payment within six months of its issuance. However, we note that this regulation concerning "stale" checks is found in Title 10 in Chapter 4, Part 4, which concerns the relationship between the payor bank and its customers. LSA-R.S. 10:4-404 provides that a bank is under no obligation to its customer to pay a check, other than a certified check, which is presented more than six months after its date, but the bank may charge its customer's account for a payment made thereafter in good faith.

Mr. Duggan's complaints to the bank, which resulted in his account being recredited with the amount of the check, did not serve as a withdrawal of his consent to the agreement. However, it did place him in breach of the defendants' contractual settlement obligation with the plaintiff.