CONI MOORE
v.
ADRIAN TALBOT, M.D.
No. 2008 CA 1370.
Court of Appeals of Louisiana, First Circuit.
February 13, 2009.
Not Designated for Publication
JACQUELINE BLANKERSHIP, JOHN H. GRIMSTAD, STEPHEN H. SHAPIRO, Counsel for Plaintiff/Appellee, Coni Moore.
DARRELL R. SIMS, JENNIFER J. THOMAS, Counsel for Defendant/Appellant, Dr. Adrian Talbot.
Before: CARTER, C.J., WHIPPLE, and DOWNING, JJ.
WHIPPLE, J.
This matter is before us on appeal by the defendant, Dr. Adrian Talbot, from a judgment of the trial court awarding plaintiff, Coni Moore, penalty wages, damages, and attorney's fees. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Coni Moore, an advanced practice registered nurse ("APRN") or nurse practitioner,[1] responded to an ad in the Times Picayune in February of 2005 placed by Dr. Talbot, who was advertising an employment position for a physician's assistant. Ms. Moore advised Dr. Talbot at the time that she was a nurse practitioner, not a physician's assistant; however, according to Ms. Moore, he advised that because the positions were similarly situated, her employment "would not be a problem." After some further negotiations, in June of 2005, Ms. Moore agreed to close the clinic she owned and sell her office equipment and medical supplies to Dr. Talbot and to begin employment with Dr. Talbot. Although later disputed by Dr. Talbot, Ms. Moore was found to have been hired for full-time employment as a nurse practitioner. After approximately one week of work, the employment arrangement deteriorated when Dr. Talbot informed Ms. Moore that he had decided that he was "going in a different direction" and would not be paying her wages of $60.00 per hour as agreed upon, but instead would pay her reduced wages of $30.00 per hour, because she had only been required to do clerical or support work.
After Dr. Talbot refused to pay the remainder of the wages due after written demand, on March 23, 2006, Ms. Moore filed a petition for damages against Dr. Talbot seeking: (1) penalty wages, interest and attorney's fees pursuant to LSA-R.S. 23:632; (2) costs arising from Dr. Talbot's use of and damage to the copy machine leased by Ms. Moore; (3) pre-judgment and post-judgment interest; and (4) all costs of the proceedings.[2]
The matter was heard by the trial court on March 12, 2008. At the conclusion of the hearing, the trial court issued oral reasons for judgment wherein the court found that the plaintiff and defendant had entered into a valid contract of employment for Ms. Moore to work as a nurse practitioner in Dr. Talbot's new clinic at the rate of $60.00 per hour. In so finding, the trial court stated that it accepted Ms. Moore's testimony as credible and true and had determined that Dr. Talbot had "lied." The trial court found that Dr. Talbot's testimony was incredible, and that Dr. Talbot had arbitrarily and capriciously, and without lawful cause, failed to pay Ms. Moore wages that were due, at the agreed upon rate of $60.00 per hour, for the work she had previously performed. Accordingly, pursuant to LSA-R.S. 23:632, the trial court awarded penalties in the amount of $20,295.00[3]. The trial court further awarded her certain costs and expense related to his damage to and the leasing of the copier, in the amount of $835.00. Finally, the trial court awarded Ms. Moore attorney's fees in the amount of $10,611.53. A written judgment was signed by the trial court on March 28, 2008.
Dr. Talbot now appeals, contending that: (1) the trial court erred in finding that Ms. Moore met her burden of proof by a preponderance of the evidence to establish that an employment agreement was reached between the parties allowing Ms. Moore to work as a nurse practitioner, where there was no collaborative practice agreement; (2) the trial court erred in awarding wages, penalties and attorney's fees under LSA-R.S. 23:632 where tender had been made and a good faith dispute existed between the parties; (3) the trial court's award of unwarranted attorney's fees was excessive; (4) and (5) the trial court erred in denying Dr. Talbot's motion for summary judgment and in ultimately granting judgment in favor of Ms. Moore on the merits, where a compromise had been perfected between the parties prior to Ms. Moore filing this lawsuit; and (6) the trial court erred in denying Dr. Talbot's motion to compel discovery of documents relevant to his defense.

DISCUSSION

Alleged Evidentiary Error (Assignment of Error Number Six)
In this assignment, Dr. Talbot contends that the trial court made an erroneous evidentiary ruling in failing to order that Ms. Moore produce copies of her income tax returns. If a trial court commits an evidentiary error and such error interdicts its fact-finding process, this court is required to conduct a de novo review. Thus, any alleged evidentiary errors must be addressed first on appeal, inasmuch as a finding of error may affect the applicable standard of review. Wright v. Bennett, XXXX-XXXX (La. App. 1st Cir. 9/28/05), 924 So. 2d 178, 182.
Louisiana Code of Civil Procedure articles 1422 through 1425 define the scope of permissible discovery and are applicable to all discovery devices. LSA-C.C.P. art. 1422; Lehmann v. American Southern Home Insurance Company, 615 So. 2d 923, 925 (La. App. 1st Cir.), writ denied, 617 So. 2d 913 (La. 1993). Generally, these articles permit discovery regarding any matter, not privileged, which is relevant to the subject matter of the action. LSA-C.C.P. art. 1422; Cantrelle Fence & Supply v. Allstate Insurance Company, 550 So. 2d 1306, 1309 (La. App. 1st Cir. 1989), writ denied, 559 So. 2d 123 (La. 1990).
The test of discoverability is not the admissibility of the particular information sought, but whether the information appears reasonably calculated to lead to the discovery of admissible evidence. Lehmann v. American Southern Home Insurance Company, 615 So. 2d at 925. The criteria of this rule are whether it is practicable and feasible to answer the inquiry and, if so, whether an answer might expedite the litigation by either narrowing the area of controversy or avoiding unnecessary testimony or providing a lead to evidence. Lehmann v. American Southern Home Insurance Company, 615 So. 2d at 925.
A trial court has broad discretion in discovery matters, including the discretion to deny discovery, Laburre v. East Jefferson General Hospital, 555 So. 2d 1381, 1385 (La. 1990), or to refuse or limit discovery of matters not relevant, unreasonably vexatious, or tardily sought. Lehmann v. American Southern Home Insurance Company, 615 So. 2d at 925. Although discovery statutes are to be liberally and broadly construed to achieve their intended objectives, Hodges v. Southern Farm Bureau Casualty Insurance Company, 433 So. 2d 125, 129 (La. 1983), in determining whether the trial court erred, this court must balance the information sought in light of the factual issues involved and the hardships that would be caused by the court's order. Lehmann v. American Southern Home Insurance Company, 615 So. 2d at 926.
Dr. Talbot filed a motion to compel discovery, seeking to have Ms. Moore answer certain interrogatories and produce certain documents. The trial court granted the motion in part, ordering that Ms. Moore produce a copy of her curriculum vitae and a copy of the collaborative practice agreement she had presented to Dr. Talbot, and denied it in part, to the extent that Dr. Talbot sought production of Ms. Moore's income tax returns for the past ten years. In denying production of the returns, the trial court found that the tax returns were not relevant, stating "[Ms. Moore] is not making a loss wage claim. She is making a breach of contract claim, the Doctor hadn't paid her."
On appeal, Dr. Talbot complains that his defense was "prejudiced" by the trial court's failure to order her to produce copies of her income tax returns for the past ten years and that the returns, particularly for the year 2005, were necessary to determine whether and how Ms. Moore claimed the $1305.00 as income. On review, we find no error.
We agree with the trial court that Ms. Moore's income tax returns were not relevant to the determination of the issues before the court herein, i.e., whether the parties had entered into an employment agreement, and, if so, the terms and substance of that agreement. Further, we reject his claim that denial of the tax returns unfairly prejudiced him in preparing his claim or caused him undue hardship or injustice, given the matters at issue. See Hodges v. Southern Farm Bureau Casualty Insurance Company, 433 So. 2d at 131. Accordingly, we find no abuse of the trial court's wide discretion in denying their production. This assignment lacks merit.

Denial of Summary Judgment[4]

(Assignment of Error Numbers Four and Five)
In the instant case, on May 10, 2007, Dr. Talbot filed a motion for summary judgment, contending therein that there were no genuine issues of material fact and that he was entitled to judgment as a matter of law. The trial court denied the motion, stating that "just one example" of a genuine issue of material fact regarding their employment arrangement was whether, as a matter of law, Ms. Moore was obligated to enter into a collaborative practice agreement with Dr. Talbot or was required to do so by Dr. Talbot. The trial court determined that given the disputed and material facts that were unresolved, Dr. Talbot failed to prove that he was entitled to judgment in his favor as a matter of law. On the record before us, we find no error.
Moreover, to the extent that Dr. Talbot claims on appeal that summary judgment should have been granted in his favor on the basis that the parties had entered into a compromise agreement prior to Ms. Moore filing suit, we first observe that Dr. Talbot did not seek or request summary judgment on the basis that her negotiation of a check constituted a compromise. Nonetheless, on the record before us, we reject Dr. Talbot's claim that Ms. Moore's negotiation of a check for wages that Dr. Talbot issued to her in the amount of $1,305.00 constituted a compromise or settlement between the parties entitling him to judgment as a matter of law.
At the time Ms. Moore cashed the check in 2005, LSA-C.C. art. 3071 provided:[5]
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
A contract of compromise must be in writing to be enforceable. LSA-C.C. art. 3071; Audubon Insurance Company v. Farr, 453 So. 2d 232 (La. 1984). A draft may serve as a written compromise where it recites that it is in full payment for all claims and the draft is endorsed and negotiated. Doiron v. Louisiana Farm Bureau Mutual Insurance Company, 98-2818 (La. App. 1st Cir. 2/18/00), 753 So. 2d 357, 361. Whether a draft has been tendered and accepted as full payment is a question of fact. Jerome v. Duggan, 609 So. 2d 1119, 1124 (La. App. 2nd Cir. 1992).
Herein, the record shows only that Ms, Moore cashed a check for wages tendered by Dr. Talbot and that the memo section of the check stated "operating expense/$30.00 x 43.5 hours." The check: (1) did not reference or set forth on its face any other terms or an agreement; (2) did not recite that it was in full payment for all claims; and (3) was not accompanied by any release documentation. Thus, the mere negotiation of the check failed to establish or serve as a written compromise. See Shell Oil Company v. Jackson, 94-1267 (La. App. 1st Cir. 5/5/95), 655 So. 2d 482, 485-486; Young v. White, 269 So. 2d 266, 269 (La. App. 34e Cir. 1972).[6]
Furthermore, a compromise is only valid if there is a meeting of the minds between the parties as to exactly what they intended when the compromise was reached. Shell Oil Company v. Jackson, 94-1267 (La. App. 1st Cir. 5/5/95), 655 So. 2d 482, 486. After Ms. Moore received the check, she undisputedly complained that the payment was insufficient and demanded that Dr. Talbot pay the remaining wages as allegedly agreed upon by the parties. Ms. Moore adamantly indicated that if she did not receive the full amount of wages due, she would pursue the matter legally. Clearly, there was no meeting of the minds or mutual agreement concerning a compromise between the parties.
After thorough review of the evidence contained in the record, we find no error in the trial court's determination that Dr. Talbot failed to establish that the parties mutually intended to settle their differences. Further, we reject Dr. Talbot's claim that her negotiation of the check evidenced or amounted to a compromise agreement precluding further litigation of her claims.
Thus, these assignments of error lack merit.

Challenges to the Finding of an Employment Relationship (Assignment of Error Number One)
Pursuant to LSA-R.S. 23:631(A)(1)(a):
Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.
In this assignment of error, Dr. Talbot challenges the trial court's factual findings that Ms. Moore was employed by Dr. Talbot, as a nurse practitioner, and at the rate of $60.00 per hour. Specifically, he contends that he cannot be held to be obligated to pay Ms. Moore wages of $60.00 per hour as a nurse practitioner because she failed to meet her burden of proving by a preponderance of the evidence that she had an employment agreement with Dr. Talbot to work as such absent evidence of a signed collaborative practice agreement between the parties allowing her to do so.[7]
The record reflects that prior to her employment by Dr. Talbot, Ms. Moore worked as a nurse practitioner at the Schumacher Group, where she was paid $50.00 per hour, and at Express Care, a clinic she owned in Covington, Louisiana, where she worked as a nurse practitioner primarily performing physical examinations for patients in workers' compensation related cases. Ms. Moore testified that Dr. Talbot hired her to provide nurse practitioner services in a clinic he was in the process of establishing in Slidell, Louisiana, and to also help the office manager set up the office. She testified that although Dr. Talbot advertised a pay rate of $80.00 per hour for the position of a physician's assistant, they agreed that her wages would start at $60.00 per hour, and that as the practice grew, her expected pay would increase to $90.00 per hour. Ms. Moore further testified that the parties agreed that since Ms. Moore was going to work for Dr. Talbot full time, she would sell all of her office equipment, supplies, and examination tables to Dr. Talbot. Included in this equipment was a copy machine that Dr. Talbot agreed to either pay off or to assume the lease.
The record further reflects that she began her employment with Dr. Talbot in June of 2005. According to Ms. Moore, on her first day of work, she presented Dr. Talbot with a collaborative practice agreement.[8] She testified that although she asked him to sign it on a daily basis, he never signed the collaborative practice agreement. Ms. Moore worked for Dr. Talbot for a total of seven days. She stated that during the time she worked for him, she helped set up the office, prepared office forms, submitted applications with various insurance companies, brought patients to examination rooms, and performed patient assessments. According to Ms. Moore, she would document the patients' complaints and assess them. Dr. Talbot would then come in and diagnose the patient and prescribe medicine. She stated that on the last day she worked for Dr. Talbot, she was supposed to meet with him to discuss the terms of the collaborative practice agreement and other issues she had concerning his office and prescription practice. Instead, Dr. Talbot telephoned the office that morning and told her that he was "going in a different direction," that he was only going to pay her $30.00 per hour, not $60.00 as promised, and that he was not going to take over the copier lease, despite having dropped and broken the copy machine while unloading and moving it to his office. Dr. Talbot told Ms. Moore that she could come to the office on Friday to pick up her pay check. However, when she arrived to pick up the check, she was presented with a check in the amount of $1,305.00, based on wages of $30.00 per hour. On June 27, 2005, Ms. Moore made written demand for her full wages in the amount of $60.00 per hour. Ms. Moore testified that in order to work for Dr. Talbot on a full time basis, she had discontinued her employment with the Schumacher Group, closed her own clinic, Express Care, and sold all of her office supplies and medical equipment to Dr. Talbot.
At trial, Dr. Talbot testified that he does not dispute that he told Ms. Moore he "would be willing" to pay "up to" $60.00 per hour to her for work as a nurse practitioner. He contended, however, that during the time she worked for him, she did not perform the tasks or duties of a nurse practitioner, as they had not entered into a collaborative practice agreement. Instead, he claimed that during this time, Ms. Moore was in an "employment application process," even though he conceded he never presented Ms. Moore with an application to be completed or a request for references.
The trial court stated it found the testimony of Ms. Moore entirely credible and that the corroborating testimony of the witnesses and the evidence submitted proved Dr. Talbot to be a "liar."[9] The trial court further stated that it was "discounting all of Dr. Talbot's testimony as incredible and unworthy of belief." In finding that the parties had entered an oral agreement for Ms. Moore to work as a nurse practitioner for Dr. Talbot at the rate of $60.00 per hour, the trial court further noted that "it makes no sense to the Court that [Ms. Moore] would agree to leave a job making $50.00 [per hour] for one paying $30.00, even if only temporarily." The trial court also found as a fact that Dr. Talbot discharged Ms. Moore and discontinued their employment relationship when he told her, "I'm going in a different direction" and that she could "pick up her check on Friday." On review, we find no error in these determinations.
The trial court's determination as to whether the parties entered into an employment agreement or relationship is a factual issue subject to the manifest error standard of review. Factual findings, including those based on determinations regarding the credibility of witnesses, cannot be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So. 2d 840, 844 (La. 1989). The appellate court must be cautious not to reweigh the evidence or substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So. 2d 216, 221. This is because in reviewing the cold record of a trial, an appellate court is not in a position to ascertain the tone in which a witness responds to a question, nor his demeanor. These and other factors play a critical role in a fact finder's evaluation of a witnesses' credibility. For this reason, great deference is afforded the trier of fact in determinations of credibility. Succession of Wagner, XXXX-XXXX (La. App. 1st Cir. 8/8/08), 993 So. 2d 709, 717.
After a thorough review of the testimony and evidence contained in the record, and considering the great deference afforded the credibility determinations made by the trial court herein, we find no error in the trial court's determination that Ms. Moore met her burden of proof herein. The above noted testimony, as believed by the trial court, establishes that the parties had entered in to an agreement for her to work for Dr. Talbot as a nurse practitioner, that her wages were to be paid at the rate of $60.00 per hour, and that she worked in his office, but was subsequently discharged by him.
Additionally, we find no merit to Dr. Talbot's argument that he "could not have agreed" to hire Ms. Moore as a nurse practitioner when they had not actually entered into a collaborative practice agreement. Nurse practitioners providing the services set forth in LSA-R.S. 37:913(3)(a), as performed by Ms. Moore herein, are not statutorily required to have a collaborative practice agreement to do so.[10] Instead, a collaborative practice agreement is only required when a nurse practitioner engages in acts of medical diagnosis and prescription. LSA-R.S. 37:913(8) and (9); see LAC Title 46, Part XLVII §4513(A) and (B).[11] Moreover, any failure of the parties to actually execute a collaborative practice agreement has no bearing on and is not determinative of the issue of whether the parties had entered into an employment relationship under which Dr. Talbot was obligated to pay Ms. Moore wages actually earned and due upon her discharge. See LSA-R.S. 23:631(A)(1)(a).
Accordingly, this assignment of error also lacks merit.

Award of Wages, Penalties, and Attorney's Fees (Assignment of Error Numbers Two and Three)
In these final assignments, Dr. Talbot challenges the trial court's decision to award wages, penalties, and attorney's fees to Ms. Moore pursuant to LSA-R.S. 23:632.[12] Dr. Talbot also challenges as excessive the amount of attorney's fees awarded.
Pursuant to LSA-R.S. 23:632, an assessment of penalties and attorney's fees may be made against an employer who fails to timely comply with the payment provisions of LSA-R.S. 23:631, as follows:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
Pursuant to the above provision, the trial court awarded Ms. Moore penalty wages in the amount of $21,600.00, less the $1,305.00 actually paid, for a total of $20,295.00. The court also awarded attorney's fees in the amount of $10,611.53. The trial court further determined that Dr. Talbot had agreed to take over the lease on the Ms. Moore's copy machine and awarded her $835.00 plus interest for the cost to repair the copier. On appeal, Dr. Talbot contends that the trial court erred in awarding penalty wages and attorney's fees, where a tender was made and a good faith dispute existed between the parties.
In determining that the penalty provisions of LSA-R.S. 23:632 should be imposed, the trial court found that Dr. Talbot "acted arbitrarily and capriciously [in] not only unilaterally abrogating the contract as regards to [Ms. Moore's] rate of pay, when in retrospect he decided to only pay her $30.00 for an agreed upon hourly [rate], but also for steadfastly refusing to pay her thereafter." The trial court noted that only partial payment had been made and that Dr. Talbot "has steadfast [sic] refused to provide the Court, and has failed to provide the Court today with a good faith, nonarbitrary defense for the nonpayment of the wages agreed upon." In addition, the trial court found that Dr. Talbot had refused to honor his agreement to purchase or assume the lease on the copy machine.
Considering the credibility determinations made by the trial court and the evidence and testimony of record herein, on review, we find no error in the trial court's determination that Dr. Talbot acted arbitrarily and capriciously or in its finding that a good faith dispute did not exist. Accordingly, we find no error in the award or the amount of penalty wages and attorney's fees, which we do not find to be excessive, given the detailed timesheet submitted and the record herein.[13]
Thus, we find no merit to these assignments.

CONCLUSION
Based on the above and foregoing reasons, the March 28, 2008 judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendant/appellant, Dr. Adrian Talbot.
AFFIRMED.
Downing, J., concurs and assigns reasons
The majority's footnote 4 notwithstanding, "[a] trial court's denial of a motion for summary judgment is not reviewable even upon appeal from a final judgment on the merits.'" Towles v. Heirs of Morrison, 428 So.2d 1029, 132 (La.App. 1 Cir. 1983). See also CITGO Petroleum Corp. v. State ex rel. Dept. of Revenue and Taxation, 02-0999, p. 10 n.8 (La.App. 1 Cir. 4/2/03), 845 So.2d 558, 563 n.8. See also La. C.C.P. art. 968, which provides in pertinent part: "An appeal does not lie from the court's refusal to render any judgment on the pleading or summary judgment." Accordingly, we have no authority to conduct the review of the denial of the motion for summary judgment.
The majority's opinion in this regard suggests that an appellate court would reverse a judgment rendered after a trial on the merits if it concludes on review that a summary judgment should have been granted. I humbly suggest that this would be an unsupportable consequence. It is my opinion that pursuant to La. C.C.P. art. 968, the issues implicated in the denial of a motion for summary judgment are subsumed into the judgment on the merits.
Even so, the majority's review of the denial of the motion for summary judgment does not affect the result and is harmless here. Therefore, I concur in the result, and I agree with the remainder of the analysis.
NOTES
[1] A "nurse practitioner" is certified by a nationally recognized certifying body as having a specialty in advanced nursing under the criteria established by the board for an "advanced practice nurse." LSA-R.S. 37:913(1).
[2] Initially, Ms. Moore filed a complaint and a copy of her demand letter with a local Justice of the Peace; however, those proceedings were later dismissed and the matter was decided by the district court.
[3] This amount was calculated at the rate of $60.00 per hour, per eight-hour day for a five-day work week, for ninety days, or $21,600.00, less the sum of $1,305.00 paid by the defendant.
[4] Louisiana Code of Civil Procedure article 2083 was amended by Acts 2005, No. 205, §1, effective January 1, 2006, to authorize the appeal of an interlocutory judgment "only when expressly provided by law." The article was amended for three reasons: (1) to eliminate the uncertainty of selection between an interlocutory appeal and supervisory writ as the proper procedure when the "overlapping and ill-defined" irreparable injury standard is thought to be applicable to the trial court's ruling; (2) because the procedures inherent in an interlocutory appeal often created unnecessary delay in the progress of a lawsuit at the trial court level; and (3) to promote uniformity and clarity in appellate practice in that there is now one delay period provided in Uniform Rule 4.3 for seeking appellate review of all interlocutory judgments except those for which an appeal is expressly provided, rather than multiple periods under the prior system when both a supervisory writ and an appeal were options. LSA-C.C.P. art. 2083, Comment (c).

Thus, the practical effect of the amendment is that an interlocutory judgment seemingly cannot be appealed, even if it causes irreparable harm. However, the stated purpose of the amendment does not show that the amendment was ever intended to provide that the right to appeal the interlocutory ruling on the appeal of a final judgment is forever lost. Instead, as this court stated in Wooley v. Amcare Health Plans of Louisiana, 2005-2025 (La. App. 1st Cir. 10/25/06), 944 So. 2d 668, in discussing the practical effect of the amendment (where this court was asked to review a judgment overruling an exception raising the objection of improper venue):
Even though an interlocutory judgment is not immediately appealable now, it can still be reviewed when an unrestricted appeal is taken from a final judgment; in such an appeal, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment. Thus, the effect of Act 205 is to change the point in time the interlocutory judgment can be reviewed on appeal; it does not repeal the review by appeal. Act 205 does not affect the validity of the defendant's claim that the venue is improper.
(Citations omitted.)
Thus, although a judgment denying a motion for summary judgment is an interlocutory judgment that is not immediately appealable, see LSA-C.C.P. arts. 968 and 2083, as with other interlocutory rulings, this court has held, in some instances, the denial of a motion for summary judgment may be reviewed, and such review is not clearly prohibited or proscribed, when an appeal is taken from a final judgment and the matter at issue in the interlocutory ruling is again raised on appeal. See Johnson v. State, Department of Social Services, XXXX-XXXX (La. App. 1st Cir. 6/9/06), 943 So. 2d 374, 377, writ denied, 2006-2866 (La. 2/2/07), 948 So. 2d 1085; Succession of Bell, XXXX-XXXX (La. App. 1st Cir. 6/8/07), 964 So. 2d 1067, 1071-1072; Dean v. Griffin Crane and Steel. Inc., XXXX-XXXX (La. App. 1st Cir. 5/5/06), 935 So. 2d 186, 189, writ denied, XXXX-XXXX (La. 9/22/06), 937 So. 2d 387. However, the Supreme Court has instructed that "[appellate courts should not rule on appeal after a full merits trial on the strength alone of affidavits in support of a motion for summary judgment that was not sustained in the district court. In such cases, appellate courts should review the entire record." Hopkins v. American Cyanamid Company, 95-1088 (La. 1/16/96), 666 So. 2d 615, 624.
[5] Louisiana Civil Code article 3071 was subsequently amended and reenacted by Acts 2007, No. 138, §1, to provide as follows:

A compromise is a contract whereby the parties, through concession made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.
Although the article is new, this modification did not change the law. LSA-C.C. art. 3071, Revision Comments-2007, Comment (a). A valid and enforceable settlement may also be a compromise if it is reduced to writing. Louisiana courts have held that "settlement" must be equated with compromise in connection with the rules governing compromise. See Townsend v. Square, 94-0758 (La. App. 4th Cir. 9/29/94), 643 So. 2d 787. LSA-C.C. art. 3071, Revision Comments-2007, Comment (c).
[6] Cf. Mallett v. McNeal, 2005-2289, 2005-2322 (La. 10/17/06), 939 So. 2d 1254 (where the Supreme Court discusses the distinction between an "unconditional payment" and a "settlement").
[7] A collaborative practice agreement is a formal written statement addressing the parameters of the collaborative practice, which are mutually agreed upon by the nurse practitioner and one or more licensed physicians. LSA-R.S. 37:913(9).
[8] Ms. Moore testified that in discussions occurring months earlier, she advised Dr. Talbot that they would need to enter into a collaborative practice agreement, as required of nurse practitioners. She stated that Dr. Talbot told her that he was not familiar with collaborative practice agreements and asked if she could email him a copy of one. Ms. Moore testified that she did so at that time.
[9] Stacy Jenkins and Laura Tomberlin, co-owners of Occupational Health Services, a drug-screening clinic that shared office space with Ms. Moore's business, Express Care, both testified that they were present during conversations with Dr. Talbot wherein he agreed to hire Ms. Moore as a nurse practitioner and purchase her office and medical equipment, including her copy machine. Ms. Tomberlin witnessed Dr. Talbot drop the copier while unloading it at his office in Slidell. Ms. Tomberlin testified that after Dr. Talbot dropped the machine, he stated that he would "take care of that."
[10] Louisiana Revised Statute 37:913(3)(a) provides as follows:

(3)(a) "Advanced practice registered nursing" means nursing by a certified registered nurse anesthetist, certified nurse midwife, clinical nurse specialist, or nurse practitioner which is based on knowledge and skills acquired in a basic nursing education program, licensure as a registered nurse, and a minimum of a master's degree with a concentration in the respective advanced practice nursing specialty which includes both didactic and clinical components, advanced knowledge in nursing theory, physical and psychosocial assessment, nursing interventions, and management of health care. Advanced practice registered nursing includes:
(i) Assessing patients, analyzing and synthesizing data, and knowledge of and applying nursing principles at an advanced level.
(ii) Providing guidance and teaching.
(iii) Working with patients and families in meeting health care needs.
(iv) Collaborating with other health care providers.
(v) Managing patients' physical and psychosocial health-illness status with regard to nursing care.
(vi) Utilizing research skills.
(vii) Analyzing multiple sources of data and identifying and performing certain acts of medical diagnosis in accordance with the collaborative practice agreement.
(viii) Making decisions in solving patient care problems and selecting treatment regimens in collaboration with a licensed physician, dentist, or other health care provider as indicated.
(ix) Consulting with or referring patients to licensed physicians, dentists, and other health care providers in accordance with a collaborative practice agreement.
[11] Section 4513 of Title 46, Part XLVII of the Louisiana Administrative Code entitled "Authorized Practice," provides in part as follows:

A. Collaboration is a process in which an APRN has a relationship with one or more physicians or dentists to deliver health care services. Such collaboration is to be evidenced by the APRN scope of practice and indicates the relationships that they have with physicians or dentists to deal with issues outside their scope of practice.
B. Scope of Practice. An advanced practice registered nurse shall practice as set forth in R.S. 37:913(3)(a) and the standards set forth in these administrative rules. The patient services provided by an APRN shall be in accord with the educational preparation of that APRN. APRNs practicing in accord with R.S. 37:913(3)(a) are not required to have a collaborative practice agreement. The APRN who engages in medical diagnosis and management shall have a collaborative practice agreement that includes, but is not limited to, the following provisions [R.S. 37:913(8) and (9)]:
1. availability of the collaborating physician or dentist for consultation or referral, or both;
2. methods of management of the collaborative practice which shall include clinical practice guidelines; and
3. coverage of the health care needs of a patient during any absence of the APRN, physician, or both parties.
[12] In her brief to this court, Ms. Moore contends that the trial court miscalculated the award for penalty wages and that the award for penalty wages should be increased. However, Ms. Moore did not file an answer to the appeal. Louisiana Code of Civil Procedure article 2133 provides that an appellee desiring to have the trial court's judgment modified, revised, or reversed is obliged to timely answer the appeal. Because Ms. Moore failed to file an answer to this appeal, we are prohibited from reviewing this issue on appeal.
[13] In calculating the award of attorney's fees, the trial court considered the fact that a significant amount of the attorney's fees were incurred in defense of various motions filed by Dr. Talbot that were meritless. Further, we reject as meritless (and unsupported) Dr. Talbot's argument that the attorney's fee award included amounts attributable to proceedings in which Ms. Moore was unrepresented.